Dolores A. McCormick, Plaintiff and Appellant, *v.* Manuel González Martínez et al., Defendants and Appellees.

No. 6419. Argued February 23, 1934.—Decided January 27, 1936.
Rehearing denied April 3, 1936.

*Carlos J. Torres Laborde* for appellant. *R. Cuevas Zequeira* for appellee González Martínez. *Hugh R. Francis* for appellee Mrs. Fabián de Lozana. *Pellón & Ayuso* for appellees, the widow and heirs of Riera.

MR. JUSTICE CÓRDOVA DÁVILA delivered the opinion of the court.

The initial complaint in this case was filed in the District Court of San Juan on January 18, 1933, and was amended three months afterwards. The defendants interposed a demurrer to the amended complaint, on the grounds that the same did not state facts sufficient to constitute a cause of action, and that the action was barred. The district court sustained this demurrer and subsequently, at the instance of the plaintiff, it rendered final judgment dismissing the complaint. Thereupon the plaintiff took the present appeal.

In order to decide the questions raised, which are based on the averments of the complaint, it becomes necessary to review the facts stated therein.

The plaintiff, Dolores A. McCormick, is the widow and sole heir of Harry A. McCormick; the defendants are Manuel González Martínez, Josefina Fabián de Lo-

zana as the sole heir of her father, Rafael Fabián y Fabián, and the widow and children of José D. Riera.

The complaint sets up separately two causes of action and contains averments which are incorporated in both counts. In the first it is alleged that, in or about March 1920, the defendant Manuel González associated with Rafael Fabián y Fabián and José D. Riera for the purpose of organizing an artificial person which, upon contributing the necessary funds, would acquire the corporeal and incorporeal property of Compañía de los Ferrocarriles de Puerto Rico and of The American Railroad Company of Porto Rico, by purchasing the 12,000 shares of the capital stock of the former, the 3,000 shares of stock and the 12,500 four per cent debenture bonds issued by the latter; and that they immediately proceeded to solicit subscriptions from various natural and artificial persons and to receive the amount thereof, one of said persons being Harry A. McCormick, who subscribed the amount of $100,000 which he paid; that other subscriptions and payments were made by the persons named in the complaint, and the proceeds were deposited to the credit of González, Fabián, and Riera in a checking account, in the Banco Territorial y Agrícola de Puerto Rico. As a part of the first cause of action, the complaint alleges that González, Fabián, and Riera disposed of some of the funds thus deposited, and bought in Paris, for the account and on behalf of the persons associated in the purchase of the railroad, 20,000,000 French francs for which they paid $1,274,636.38, which they withdrew from the said checking account; and that they subsequently sold said francs at a profit of $317,073.77, which was not deposited, either wholly or partially, as a part of the common fund of the business, and which González, Fabián, and Riera appropriated to their own use.

The basis of the second cause of action is that the three gentlemen above named, acting in the aforesaid manner, on

April 10, 1920, entered into a contract with George Servajean, in his capacity as representative of the two companies above mentioned, whereby the latter agreed to sell and the former to purchase, for a price of $1,600,000, the capital stock of said companies and the bonds of The American Railroad Company of Porto Rico; that on the same date, April 10, 1920, González, Fabián, and Riera entered into a written agreement with the other associated subscribers, wherein the conditions respecting the capital contributions, which amounted to $2,628,200, were set forth, and as an essential condition attached to such contributions, there was stipulated, in the second paragraph of the document signed by González, Fabián, and Riera, and by the other persons associated in the aforesaid business, the following:

"All the subscribers shall decide afterwards whether the companies are to continue as at present, or whether they will organize a new company, but in the meantime, all the subscribers shall be the owners of the purchased shares of stock in both companies, as well as of the bonds of The American Railroad Company of Porto Rico, in proportion to the amounts which they shall contribute to the business, taking as a basis the cost already stated, and it is agreed that either upon forming the new company or upon selling the business, any profits which may be made shall be distributed equitably in proportion to their contributions to this business."

It was further alleged that González, Fabián, and Riera received from Servajean 11,048 shares of the capital stock of the Compañía de los Ferrocarriles de Puerto Rico, 3,000 shares, or the whole of the stock of The American Railroad Company of Porto Rico, and 11,193 debenture bonds of said corporation, leaving 32 of the bonds and 952 shares of the Compañía de los Ferrocarriles de Puerto Rico outstanding and the total value of which has been deposited in a bank in Paris; and that González, Fabián, and Riera falsely stated to their associates in the business above referred to, that they had contracted with Servajean to pay him the amount of $550,000 as a commission on the purchase of the aforesaid

shares of stock and bonds, whereas in point of fact they had not undertaken such an obligation nor had said commission been demanded from them by Servajean, to whom no commission whatsoever was delivered by the said three gentlemen, who on May 27, 1920, appropriated to themselves the said $550,000.

Based on the above allegations, the plaintiff prayed that the defendants be adjuged to pay to her $36,100 as profits made in the purchase of francs, at the rate of 360 mills on each dollar contributed, and $62,700 on the $550,000 to which the second cause of action refers, at the rate of 627 mills on each dollar, plus interest and costs.

The facts stated in the amended complaint may be summarized as follows: That the defendants purchased and resold francs with the funds collected for the purchase of the railroad, and appropriated to their own use the profit which they obtained in that transaction; that the defendants falsely told the subscribers to the common fund that in connection with the purchase of said shares and bonds a certain sum had to be paid to a third person as his commission, when in fact no payment whatsoever was made; and that the three defendants appropriated to their own use the money which they said they had to pay.

We have read the opinion delivered by the lower court and the conclusions of law therein set forth. The demurrer for insufficiency of the complaint was sustained, as, in the opinion of the trial court, González, Fabián, and Riera fulfilled literally the contracted obligation, by purchasing the shares and bonds and giving to each subscriber of the fund the number of shares belonging to him. Once this obligation was discharged, the plaintiff had no right to share in the profit derived from the purchase and resale of francs with the funds collected for the acquisition of the railroad. The lower court also declared that the second cause of action was barred whether section 1802 or any other provision of the Civil Code of Puerto Rico were applied, for more than

twelve years had elapsed from the occurrence of the facts relied upon for the present action until the commencement thereof. As these are the questions decided by the court *a quo,* we shall confine ourselves to them in the discussion of this case.

It is contended that the complaint does not state facts sufficient to constitute a cause of action, because it is not stated therein that the defendants have violated any right of the plaintiff, Dolores A. McCormick, or of Harry A. McCormick, her predecessor in interest. The defendants rest this ground of demurrer on the fact that the agreement was to acquire the corporeal and incorporeal property of the railroad companies for a certain price, and that the subscribers should become the owners of the shares of stock so acquired in proportion to the amount which each contributed to the undertaking all of which has been carried in accordance with the stipulations made, for it has not been alleged in the complaint that they had failed to purchase the shares of stock, or to deliver to each subscriber the number of shares proportionate to the amount which each one contributed. The only omission is the failure to give to each subscriber a share in the profits obtained from the purchase and resale of the francs. The defendants maintain that at no time did either of them bind himself, upon receiving the money in payment of the shares purchased by each subscriber or upon depositing said money in the defendants' checking account, to give the subscribers any share in the profits obtained in a private transaction which concerned the defendants only, just as the subscribers could never have been liable for any loss which might have resulted from such a transaction.

The plaintiff, relying on the existence of an agency, maintains that the relation of principal and agent is one of strict confidence between the parties, that the agent cannot speculate in the subject matter of the agency in order to obtain a profit therefrom, and that he may be required by the principal or mandator to account for any profits received by him

in violation of his duties, even though it appears that the principal did not suffer any loss due to the fraud or otherwise, or for any secret profit he might have received.

There is no doubt that the contract of agency is one of strict confidence and that the relation created by virtue of such contract is of a fiduciary character. Manresa acknowledges it to be so when he says that "on analyzing the sixty-two extracts of title 1, book 17 of the Digest, the twenty-five laws of title 35 of book 4 of the Code, and title 26 of book 3 of the Institutes, one readily appreciates the great accuracy with which the interpreters and commentators defined this contract, summing up the spirit thereof, as a genuine expression of friendship and confidence; and even the etymological sense, *manusdatio,* expressive in its literal meaning of the act of principal and agent shaking hands, seems to confirm the correctness of that view, enabling the commentators, therefore, to define the contract with their customary eloquence, as follows: *Contractus consensualis quo negotio honestum alteri suscipienti gratis gerendum committitur.*" 11 Manresa 369.

Pomeroy, in his treatise on Equity Jurisprudence, volume 2, paragraph 959, says that equity regards the relation of principal and agent in the same manner and with the same strictness as that of trustee and beneficiary.

The relation established between González, Fabián, and Riera, and the persons who contributed their money to the acquisition of the property of the railroad companies, was in reality a fiduciary relation. It appears from the averments of the complaint, which must be taken as true for the purposes of the demurrer, that the defendants, by using the money which had been intrusted to them for the said undertaking, made a profit which they retained, without accounting therefor to the subscribers to the fund. Manresa points out that "an agent who receives a sum for his principal and instead of forwarding the money retains it in his possession and applies it to his own use, without any authority there-

for, commits a true embezzlement, or as our *Partidas* would call it, a 'wrongful enrichment' *(enriquecimiento torticero).''* 11 Manresa 454. Similarly it may be said that when an agent receives funds for a certain purpose and uses them for his own benefit, making profits from said use, he commits a true embezzlement which constitutes a wrongful enrichment. It is true that section 1615 of the Civil Code, 1930 edition, provides that an agent shall be liable for interest upon any sums he may have applied to his own use, from the day on which he did so, and upon those which he still owes, after the expiration of the agency, from the time of his default; but this does not mean that the principal is confined to demand exclusively interest on the amounts so applied. In our opinion, when the agent applies funds in his possession to his own use, the principal may claim interest thereon if no profits have been made, and if there are any profits, he may choose between claiming interest or the profits received. A person who has thus wrongfully enriched himself should not be entitled to retain, against the will of the principal, the profits made. To hold the contrary would be tantamount to rewarding him for his unlawful act, which would turn into a lucrative and profitable business the wrongful act of using for his own benefit the funds belonging to his principal. According to our code, an agent can not exceed the scope of his authority. When he exceeds his powers, to the extent of applying to his own use the funds which he may have received by virtue of the confidence reposed in him, he must account to the principal for any profits derived from such use.

The facts in *United States* v. *Carter,* 217 U. S. 286, 305, are far from being similar to those herein alleged by the plaintiff in support of her cause of action, but the Supreme Court of the United States in its opinion treats of the fiduciary relation created between principal and agent, and states principles which may well be applied to the present litigation. In the cited case, Oberlin M. Carter, an engineer officer in the army of the United States who had prepared the

plans and specifications that served as a basis for certain contracts, led out under biddings conducted by him, was charged with having shared in the profits obtained by the contractors Gaynor and Greene, and with having conspired with them to defraud the United States. These contracts were executed, the appropriations disbursed, and the work supervised and accepted by said officer, or under his advice and recommendation, by the War Department. Although the trial court substantially rendered a decree in favor of the United States, it held that Carter's course in the premises was not necessarily an abuse of the discretion vested in him, nor seriously inconsistent with his claim that he had discharged his duty to the Government. The Circuit Court of Appeals agreed that the evidence considered by the lower court, taken independently of the entire chain of circumstances, justified its findings, but held that, when all the circumstances of the case were considered, the evidence tended to prove actual knowledge on the part of Carter of the excessive profit obtained by the contractors, his share therein, and his complicity in the fraudulent transactions. After referring to the conclusions established by the trial court and the Circuit Court of Appeals, the Supreme Court of the United States expressed itself as follows:

"If it be once assumed that the defendant Carter did secretly receive from Greene and Gaynor a proportion of the profits gained by them in the execution of the contracts in question, the right of the United States in equity to a decree against him for the share so received is made out. It is immaterial if that appears whether the complainant was able to show any specific abuse of discretion, or whether it was able to show that it had suffered any actual loss by fraud or otherwise. It is not enough for one occupying a confidential relation to another, who is shown to have secretly received a benefit from the opposite party, to say, 'You cannot show any fraud, or you cannot show that you have sustained any loss by my conduct.' Such an agent has the power to conceal his fraud and hide the injury done his principal. It would be a dangerous precedent to lay down as law that unless some affirmative fraud or loss can be shown,

the agent may hold on to any secret benefit he may be able to make out of his agency. The larger interests of public justice will not tolerate, under any circumstances, that a public official shall retain any profit or advantage which he may realize through the acquirement of an interest in conflict with his fidelity as an agent. If he takes any gift, gratuity or benefit in violation of his duty, or acquires any interest adverse to his principal without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received.''

This doctrine covers all persons occupying a fiduciary relation with respect to others, and who are unfaithful to the confidence reposed in them. The principle is the same, and a dangerous precedent would be established if an agent who disposes of the funds of his principal were to be permitted to wrongfully enrich himself, by retaining the profits which the unlawful use of said funds may have brought to him.

We will further copy from the opinion of the Supreme Court in the above-cited case, as follows:

''The doctrine is well established and has been applied in many relations of agency or trust. The disability results not from the subject-matter but from the fiduciary character of the one against whom it is applied. It is founded on reason and the nature of the relation and is of paramount importance. 'It is of no moment,' said Lord Thurlow, in *The New York Building Company* v. *Alexander Mackenzie,* 3 Paton 378, 'what the particular name or description, whether of character or office, situation or position is, on which the disability attaches.' Thus, in *Aberdeen Railroad Company* v. *Blaikie Brother,* 1 MacQueen's Appeal Cases, 461, 472, it was applied to a contract of a director dealing in behalf of his company. Lord Chancellor Cranworth, in respect to the general rule, said:

'' 'And it is a rule of universal application, that no one having such duties to discharge, shall be allowed to enter into engagements in which he has, or can have, a personal interest conflicting, or which possibly may conflict with the interest of those he is bound to protect.

'' ' *    *    *    *    *    *    *

'' 'It is true that the questions have generally arisen on agreements for purchases or leases of land, and not, as here, on a contract of a mercantile character. But this can make no difference in principle. The inability to contract depends not on the subject-matter

of the agreement, but on the fiduciary character of the contracting party, and I cannot entertain a doubt of its being applicable to the case of a party who is acting as manager of a mercantile or trading business for the benefit of others, no less than to that of an agent or trustee employed in selling or letting land.' ''

There is no doubt that an agent who applies to his own use funds belonging to his principal is acting against the interest of the latter. Such funds run the risk of being diminished or lost, and even though the agent is liable for their return, his liability may become illusory if he lacks property with which to answer therefor. And even if he does restore the funds disposed of, his conduct would be no less abusive or tortious by reason of such restitution. The liability should also extend to the profits.

Pomeroy in his treatise ''Equity Jurisprudence,'' volume 2, p. 1564, par. 1052, says:

''The doctrine may be stated in its most general form, that whenever a trustee or person clothed with any fiduciary character takes advantage of the relation, and by means of it acquires the title or use of the trust property, or makes a profit or advantage to himself out of the trust and confidence, then a constructive trust is impressed upon such property, profits, or proceeds in his hands, in favor of the original beneficiary. The following are some of the most important applications of this doctrine: When a trustee, administrator, agent, attorney, or other fiduciary person, without the knowledge or consent of his beneficiary, purchases the trust property at a public or private sale; or when, by taking advantage of the trust and confidence reposed, and of the superiority conferred upon him by the relation, he unconscientiously acquires title to the trust property by purchase or gift directly from the beneficiary; or when he uses the trust property for his own benefit, or in his own business, and by means of such use obtains additional gains and profits,—in these and all similar cases equity impresses a constructive trust upon the property purchased or obtained, and upon the profits and acquisitions so made, for the benefit of the party beneficially entitled. This form of constructive trusts embraces many particular instances, and the principle is extended to all abuses of confidence, whereby the one in whom the confidence is reposed obtains an advantage.''

In *Shaler* v. *Trowbridge*, 28 N. J. Eq. 595, Scott "Cases on Trust," p. 523, the Court of Appeals and Errors of New Jersey said:

"If a person, occupying a fiduciary capacity, purchases property with fiduciary funds in his hands, and takes the title in his own name, he will, by construction, be charged as a trustee for the person entitled to the beneficial interest in the fund with which such purchase was made. This rule applies to a partner who fraudulently purchases for himself with the partnership funds, and it extends to personal as well as real estate; in every case the equitable ownership rests in the person from whom the consideration moves. (Citations.)

"In *Taylor* v. *Plumer*, 3 M. & S. 575, Lord Ellenborough said that if A is trusted by B with money to purchase a horse for him and he purchases a carriage with that money, B is entitled to the carriage. That it made no difference, in reason or in law, into what other form, different from the original, the change may have been made, for the product of or substitute for the original thing still follows the nature of the thing itself, as long as it can be ascertained to be such, and the right ceases only when the means of ascertainment fail. This is declared to be the settled rule, in Story's Eq. Juris., secs. 1258, 1259.

"So completely are the two things identified, even at law, where the conversion can be clearly traced, that in equity a distinction can never be drawn, between the money misappropriated and the results of its investment, in favor of the fraud-doer.

"Nor does it make any difference that the investment turns out to be a profitable one, for, whatever the profit may be, it must belong to the *cestui que trust*. It is a constructive fraud upon the latter to use his property unlawfully and to retain the profit of the misapplication, it being a fundamental principle in regard to a trustee that he shall derive no gain to himself from the employment of the trust fund. (Citations.)

"Much more does public policy require that one who has corruptly thrust himself into the position of a trustee, shall not profit by his fraud."

In the above-cited decision the retention of profits tortiously obtained is considered as a constructive fraud, and it is stated that it is a fundamental principle in regard to a trustee that he shall derive no gain to himself from the em-

ployment of the trust fund. This doctrine arises from the fiduciary relation which in a case like this is clear and manifest. Regardless of the name that may be given to the relation contracted by González, Fabián, and Riera, with the subscribers to the fund, it cannot be denied that, taking the averments of the complaint as true, such relation was a fiduciary one.

In *Ash* v. *A. B. Frank Co.,* 142 S. W. 42, the Court of Civil Appeals of Texas expressed itself as follows:

"The facts make this a case of principal and agent, the latter being appointed, under appellee's theory, to collect certain money and pay off certain debts, and, if the agent has acted in bad faith with his principal, the latter can recover from him such part of the funds as have not been appropriated under the terms and conditions of the agency. It is a well-settled and statutory rule that all profits made and advantage gained by the agent in the execution of the agency belong to the principal. Nor does it matter that the principal was not in fact injured by the intervention of the agent for his own benefit. If he acquires a profit legitimately in dealing with the subject-matter of his agency, or if he departs from his instructions and obtains a better result than by following them, the principal may claim such advantage. The agent is under obligation to act in the utmost good faith with his principal, and will not be permitted to make a profit out of the trust fund or to divert it from the purposes intended. Mechem on Agency, sec. 469."

Section 112 of our Code of Commerce provides:

"The partners can not apply the funds of the copartnership nor make use of the firm signature for business for their own account; and should they do so, they shall lose to the benefit of the company that part of the profit which in the transaction or transactions made in this manner may be due them, and the articles of copartnership in so far as they are concerned shall be annulled, without prejudice to the return of the funds they may have made use of, and to indemnify the copartnership for all loss and damage which it may have suffered."

In the instant case, according to the averments of the complaint, the subscribers delivered their money to González, Fabián, and Riera for a common purpose: the acquisition of

the corporeal and incorporeal property of the railroad companies. That was the only purpose for which the money was delivered to the three gentlemen aforementioned. The applicable principle is just the same, in accordance with the natural reason and the general principles of law. The essential thing is that a fiduciary relation arises, both in the civil as in the mercantile order, as it happens in the instant case, wherein according to the averments, money was delivered for a certain purpose and was disposed of for private purposes by the persons in charge of executing the will of the subscribers. For these reasons we hold that the facts set forth in the complaint state a cause of action.

■ The defendants claim that the suit herein is barred. The lower court made no pronouncement on this point as regards the first cause of action, undoubtedly because it did not deem it necessary after it had declared that in its opinion said cause of action was groundless. The defendants in lengthy and elaborate briefs discuss the effects of direct and incidental fraud (*dolo*) in the making of contracts and in the performance thereof, and say that the fraud charged (profit in the purchase of francs, concealing such fact to the prejudice of the subscribers, and the alleged payment of a commission to George Servajean), construing the averments of the complaint with the utmost liberality, has only the character of incidental fraud which would render the party liable only for damages, provided the claim were instituted in accordance with the provisions of the law which governs the prosecution of such actions. It is argued that, if there was fraud, the action has prescribed according to section 1253 of the Civil Code.

In the instant case no contract whatever is sought to be annulled, nor is a subsidiary claim for damages made. The prayer is simply for the delivery of the profits made with money which belonged to the plaintiff's predecessor in interest, and which the defendants applied to their own use.

Therefore, section 1253 of the Civil Code, 1930 edition, according to which the action of annulment shall last four years, counted from the date of the consummation of the contract in cases of error or deceit (*dolo*) or falsity of consideration, is not applicable. Emphasis is laid, however, on the incidental fraud for the purpose of making said section applicable.

In our opinion, even conceding that, under the averments of the complaint, the conduct of the defendants might be characterized as deceitful (*dolosa*), section 1253 of the Civil Code would still be inapplicable. There is some difference between the effect of fraudulent conduct (*dolo*) which induces the contracting of obligations and that which tends to evade the fulfillment thereof. Section 1055 of the Civil Code provides that the liability arising from fraud is demandable in all obligations. The concept of fraud with which this section deals consists, according to Manresa, in the conscious and wilful purpose of evading the normal fulfillment of obligations. Construing section 1102 of the Spanish Civil Code, equivalent to section 1055 of our code, the cited commentator says:

"It is opportune to express that concept of fraud, as precisely one of the two questions raised in connection with the interpretation of the few provisions contained in this section, the fairness of which is manifest, consists in the determination of what the lawmaker means by fraud, a word which he uses and does not explain in this instance, contrary to the practice followed in drafting the provisions regarding other cases of nonperformance. As there is another section (1269) in our Code which also deals with obligations, and which defines fraud as one of the causes of invalidity of the consent in contracts, it might be thought that such an omission, notwithstanding the differences of place, language, and subject matter existing between said section and section 1102, implies a reference to the definition set forth in the former in order to supply the omission made in the latter. However, we think otherwise, because a careful reading of the definition in question, contained in section 1269, is sufficient to perceive that, as the same has been made with respect to a different situation, it relates to an aspect and species of fraud:

that existing from the beginning as an inducement to *the obligation* incurred and which might be *ground for nullity* (and for a claim for damages as well), and it can not embrace the general concept of fraud nor that manifestation thereof which appears in connection with the *performance* of obligations *previously contracted* and which *gives rise to liability*.

"Therefore, and despite the connection between the definition contained in section 1269 and the concept of fraud which we have expressed, regarding the theory and meaning of the section we are now discussing, we think that such a concept and not the said definition should be applied here, the omission made in the code being explainable by the clearness of the principle to which it refers. For this assertion and for the distinction we have made between the two indicated concepts of fraud, we find firm support in the decisions of the Supreme Court, which has held (Judgment of October 22, 1894) that 'Section 1102 applies rather to fraud connected with the performance of obligations than to that in which they originated, a doctrine which is confirmed by the wording of the subsequent sections and that of the preceding section.'" 8 Manresa 64.

As we have already said, in the instant case nothing is sought to be annulled nor is there any compensation whatever claimed as damages. The appellant confines herself to a demand for the delivery of the profits made by the wrongful use of funds belonging to her. The action brought must be governed by section 1864 of the Civil Code, according to which personal actions for which no special term of prescription is fixed prescribe after fifteen years.

■■ In the second cause of action it was alleged that Fabián, González, and Riera falsely stated to their associates that they had agreed to pay the sum of $550,000 as a commission, when in point of fact they had not contracted such an obligation, nor was said commission demanded by, or paid to, Servajean by the said gentlemen, who appropriated the said sum to themselves. It is now urged that this cause of action is also barred, because the deceitful act with which González, Fabián, and Riera are charged is governed by the term of prescription provided in section 1253 of the Civil Code. In the second cause of action, as in the first, the plain-

tiff does not seek the annulment of any contract whatsoever. She claims the return of a certain sum which her predecessor in interest paid on the belief that it was lawfully due. According to section 1054 of the Civil Code, any person who is guilty of fraud, negligence, or delay in the fulfillment of his obligations, or who in any manner whatsoever shall fail to comply with the terms thereof, shall be liable for any damage caused thereby. We agree that there is fraud (*dolo*) involved in the statements attributed to González, Fabián, and Riera in this second cause of action, but we think that the term of four years prescribed by law for bringing an action for the annulment of a contract, to be counted from the date of the consummation thereof, cannot be applied to the deceitful act charged herein. And if there be involved a right of action arising from fault or negligence under section 1802 of the Civil Code, we cannot hold, either, that the action is barred, as the day on which the plaintiff had knowledge of the facts that serve as a basis for this second cause of action does not appear from the complaint, and in accordance with section 1868 of the Civil Code (1930 edition), actions to enforce civil liability for obligations arising from fault or negligence, mentioned in section 1802, prescribe in one year, computed from the time the aggrieved person had knowledge thereof.

It now remains for us to consider the ruling made upon the demurrer filed by the widow and heirs of José D. Riera. It is urged that the causes of action set up have prescribed according to section 41 of the Code of Civil Procedure. From the allegations of the complaint it appears that the plaintiff's predecessor in interest died on October 17, 1927, and that this suit was commenced in 1933. The cited section provides that if a person entitled to bring an action die before the expiration of the term limited for the commencement thereof, and the cause of action survive, an action may be commenced by his representatives, after the expiration of that time, and within one year from his death.

The defendants who interposed this demurrer on the ground of prescription, state that the same was based on the first clause of section 41 of the Code of Civil Procedure already transcribed, and not on the second, which in their opinion is not applicable in this jurisdiction.

Construing the above-mentioned provision, which is equivalent to section 353 of the Code of Civil Procedure of California, the Supreme Court of that State, in *Lowell* v. *Kier*, 50 Cal. 646, 648, said:

"The first clause of section 353 of the Code of Civil Procedure, while it may under some circumstances prolong the time originally limited, cannot operate in any case to shorten it."

We have stated that the first cause of action prescribes after fifteen years. At the time of the filing of the complaint herein, the term fixed by law for bringing this action had not yet expired. As regards the second cause of action, we have said that it does not appear from the facts set forth in the complaint that the same is barred. The first clause of section 41 can not operate to shorten the term fixed for prescription. As the California court says, it may under certain circumstances prolong it, but it can not shorten it in any case.

Starting from the premise that González, Fabián, and José D. Riera formed a partnership, the widow and the heirs of Riera contend that there is no cause of action against the defendants, and that if any cause of action exists at all, it should be directed against such partnership. In the complaint there is no basis to maintain that these gentlemen have organized an association with all the characteristic and fundamental elements of a partnership. The -defendants who interposed this demurrer rely on the fact that in the second paragraph of the complaint it is stated that the defendant Manuel González Martínez, in or about March 1920, associated with Rafael Fabián y Fabián, and José D. Riera, for the purpose of organizing an artificial person. From the use

of this term we can not reach the conclusion that those gentlemen formed a partnership. This is a question of fact which does not appear from the complaint, and which must be determined by the evidence. It will then be time to argue the question of law raised by the defendants.

It is further urged that the action has prescribed in accordance with section 945 of the Code of Commerce of Puerto Rico, which reads as follows:

"Actions against the managing and directing members of associations shall terminate at the end of four years, to be counted from the time they cease to manage the same for any reason whatsoever."

It is assumed in this ground of demurrer that José D. Riera was a managing partner of the general partnership González, Fabián, and Riera, and that he ceased as such managing partner from the time of his death on May 6, 1920. It is argued that if any cause of action existed against him by reason of his conduct as the managing partner of said mercantile firm, the action should have been commenced within the four years immediately following his death. We have already stated that it does not appear from the complaint that there had been constituted the partnership referred to by the defendants. Hence, it is not necessary to discuss the question thus raised by said defendants, and the demurrer filed was properly overruled.

Lastly it is contended that according to the second cause of action set up, the misappropriation of the $550,000 by Fabián, González, and Riera occurred on May 27, 1920, whereas in fact José D. Riera died on the 6th of the same month, or several days prior to the date on which said gentlemen are alleged to have appropriated to themselves the said sum. It is clear that Riera could not have participated in the act charged, which, by the terms of the complaint, took place after his death. It is not alleged that the widow of Riera and his heirs have received any benefit whatsoever from the

misapplied funds. As it is not stated that they have shared in that sum, no liability whatever arises on their part with respect to the plaintiff. For the reasons stated, this ground of demurrer for insufficiency as to the second cause of action must be sustained, and the plaintiff is granted a term of ten days to amend the complaint, if she is in a position to do so.

The judgment appealed from must be reversed and only the demurrer to the second cause of action filed by the widow and the heirs of Riera should be sustained, the plaintiff being granted ten days to amend the complaint, to be counted from the date on which the case shall be remanded to the lower court for further proceedings not inconsistent with the terms of this opinion.

ON MOTION FOR REHEARING
April 3, 1936

MR. JUSTICE CÓRDOVA DÁVILA delivered the opinion of the court.

The defendants Manuel González Martínez and Josefina Fabián de Lozana have moved for a reconsideration of our judgment on the ground that the same is erroneous in so far as it regards the agreement entered into between the plaintiff's predecessor in interest and the defendants as a contract of agency. We have studied the questions raised by the assignment of the errors claimed to have been committed by the lower court in the opinion on which the judgment appealed from was based. We said that the relation established between Messrs. González, Fabián, and Riera, and the persons who delivered their money for the purchase of the properties of the railroad companies was a fiduciary one. Then we stated our views with respect to the relation of strict confidence which is established between mandator and mandatory and between principal and agent, and cited the opinion of Manresa as regards the civil law and that of the text writer Pomeroy as regards the American jurisprudence. There is no doubt that, upon accepting the trust (*encomienda*) to use the funds received in the purchase of the properties

of the railroad companies, Messrs. González, Fabián, and Riera became the agents of the persons who delivered those funds to them for that purpose. The question of whether or not this relation involves a contract of agency under the civil law is of no importance. We have already said in our former opinion that ''regardless of the name that may be given to the relation contracted by González, Fabián, and Riera, with the subscribers to the fund, it cannot be denied that, taking the averments of the complaint as true, such relation was a fiduciary one.''

''In the instant case,'' we further said, ''according to the averments of the complaint, the subscribers delivered their money to González, Fabián, and Riera for a common purpose: the acquisition of the corporeal and incorporeal property of the railroad companies. That was the only purpose for which the money was delivered to the three gentlemen aforementioned. The applicable principle is just the same, in accordance with the natural reason and the general principles of law. The essential thing is that a fiduciary relation arises, both in the civil as in the mercantile order, as it happens in the instant case, wherein according to the averments, money was delivered for a certain purpose and was disposed of for private purposes by the persons in charge of executing the will of the subscribers. For these reasons we hold that the facts set forth in the complaint state a cause of action.''

The petitioners and appellees argue that, even conceding that the juridical relation established between the parties, as alleged in the complaint, had the fiduciary character pertaining to an agency, this court erred in applying to the controversy principles of jurisprudence which were absolutely foreign and contrary to the positive law that historically and traditionally governs the contracts of agency in Puerto Rico and Spain.

We do not agree with the argument thus put forth by the learned counsel in support of their contention regarding this

most important question. Our civil law would be too deficient and lacking in foresight were it to permit a person, who is in possession of property belonging to another and which was received for a certain purpose to profit by appropriating to his own use such property and applying the same to other purposes, through acts which are penalized even under our criminal statutes. Our civil law, which is saturated with equitable principles, had its origin in the Roman law. The natural justice (*razón natural*), as embodied in the general principles of law, which the courts must take into account when there is no statute applicable to the case, is the equity defined in the Pandects that has been incorporated in section 7 of our Civil Code and outlined although less fully, in section 6 of the Spanish Civil Code. The principles of equity were first applied in England by the courts of chancery, and in ancient Rome by the praetors. An ancient philosopher defined the true nature of equity by saying that it is a correction of the law, where by reason of its universality it is deficient. In *Stewart* v. *Jones,* 219 Mo. 614, 131 Am. St. Rep. 595, 606, citation is made of the definition of Aristotle, which has been approved by so distinguished authors as Grotius, Puffendorf, Blackstone, and Story, and it is said that the law is frequently enlarged and enriched by borrowing equitable principles and that the maxim, ''Equity follows the law,'' has play in arriving at just ends in the administration of justice. Story says that this maxim may mean that equity adopts and follows the rules of law in all cases to which those rules may in terms be applicable; or it may mean that equity, in dealing with cases of an equitable nature adopts and follows the analogies furnished by the rules of law.

It is argued that in the former opinion of this court it is repeatedly asserted that the relation established between Messrs. González, Fabián, and Riera, and the subscribers to the fund is a fiduciary one, and that in accordance with this conclusion this court was bound to determine whether or not there had been any violation of the provisions of the Civil

Code applicable to the agency, which, as claimed by the defendants, constitute the only legislation governing the contracts whereby fiduciary relations are created. This question was sufficiently discussed in our former opinion. We said then, and now repeat, that "It is true that section 1615 of the Civil Code, 1930 edition, provides that an agent shall be liable for interest upon any sums he may have applied to his own use, from the day on which he did so, . . . . but this does not mean that the principal is confined to demand exclusively interest on the amounts so applied. . . . . when the agent applies funds in his possession to his own use, the principal may claim interest thereon if no profits have been made, and if there are any profits, he may choose between claiming interest or the profits received. A person who has thus wrongfully enriched himself should not be entitled to retain, against the will of the principal, the profits made. To hold the contrary would be tantamount to rewarding him for his unlawful act, which would turn into a lucrative and profitable business the wrongful act of using for his own benefit the funds belonging to his principal. According to our code, an agent can not exceed the scope of his authority. When he exceeds his powers, to the extent of applying to his own use the funds which he received by virtue of the confidence reposed in him, he must account to the principal for any profits derived from such use."

As we have said, a person who entrusts funds to another should not be confined to a claim for interest thereon, where such funds have been wrongfully used by the holder thereof for his own benefit, as if they belonged to him, and profits have been derived from such use. This applies to the case when the contracted relation is governed by the provisions relating to agency. But if, as claimed by the defendants, a contract of agency is not involved herein, then the limitation imposed, according to them, by section 1615 of the Civil Code should be ignored, as its provisions would be inapplicable. That the relation established between Messrs. González, Fa-

bián, and Riera and the subscribers to the fund is a fiduciary one cannot be denied. A contract of agency, with all its characteristics, would not establish a relation of greater trust and confidence than that which arises from the averments of the complaint. Messrs. González, Fabián, and Riera accepted the funds entrusted to their custody to apply them to a certain purpose. Therefore, they acted as executing agents of the owners of those funds, who placed their confidence in them. If the contracted relation was a fiduciary one, it would make no difference, for the purposes of the liability of the defendants respecting the profits made in accordance with the averments of the complaint, whether such relation be called mandate or agency, or whether it be designated by any other name.

It is urged that this court erred in holding that the action brought by the plaintiff is governed, as regards prescription, by section 1864 of the Civil Code. It is said that, as this Supreme Court has considered that the juridical and fiduciary relation existing between the parties has the character of an agency, the provisions of the Civil Code which protect the right of an aggrieved principal must be resorted to in order to determine the nature of the action exercised. "That being so, and taking into account the facts charged against the defendants in order to determine the applicable limitation period, the conclusion is unavoidable that the action brought by the plaintiff has for its sole object the recovery of damages, irrespective of the title that the plaintiff may have given to her complaint." The defendants thus argue in maintaining that we have erred in holding that the plaintiff does not claim any indemnity for damages but the amount of a certain profit which she failed to obtain by reason of the conduct of the defendants. The error attributed to us is nonexistent. We have declared that in the instant case it is not sought to annul any contract nor is there any claim for damages made. The defendants rely on section 1073 of the Civil Code (sec. 1059, 1930 ed.), which they

cite and which provides that indemnity for losses and damages includes not only the amount of the loss which may have been suffered, but also that of the profit which the creditor may have failed to realize.

The profits to which the cited section refers are those which the creditor might have obtained but failed to receive in consequence of the nonfulfillment of the obligation. In the instant case, the plaintiff's predecessor in interest has not been deprived of any profit which he might have obtained and failed to receive in consequence of the nonfulfillment of the obligation. The claim is simply for the profits made by the defendants in a transaction wherein they applied to their own use certain moneys which were entrusted to their custody, and which belonged to the subscribers to the fund. In commenting on the code provisions cited by the defendants, Scaevola and Manresa mention the positive damage (*daño emergente*) and the loss of prospective profits (*lucro cesante*), in connection with the specific applications thereof under the old law. Referring to the loss of prospective profits, Scaevola says in part as follows:

"Lost profits as an element of damages (*interés del lucro cesante*) is said to be the gain which is not realized or the loss of gains which is suffered in the money or thing owed and not paid within the time agreed. This element may be either intrinsic or extrinsic, the former designation being applied to the price which the thing might have fetched at the time the obligation should have been fulfilled but was not fulfilled, and the latter being subdivided into two classes, *circa rem* and *extra rem*, which are respectively defined as that which arises from the thing itself, such as the fruits, the offspring of cattle, and the *quasi* fruits, as the rent on leases; and that which derives from the thing, not directly but indirectly, as the payment of interest to merchants." 19 Scaevola 558.

The defendants conclude by saying "that the complaint wherein it is sought to recover the profits of which the plaintiff's predecessor in interest is alleged to have been deprived, is technically and juridically a claim for damages which pre-

scribes after four years from the consummation of the contract, for it is based on deceit (*dolo*), fraud, or wrongful enrichment which is a deceitful act.'' We fail to see how can there be any application of section 1253 of the Civil Code, which fixes the term of four years for the prosecution of actions for the annulment of contracts, where no prayer for the annulment of any contract is made in the complaint, and where even if it were conceded that an action for damages had been brought, a fact which we have denied, the term fixed by said section for the prescription of the action for nullity of a contract, would be inapplicable. As regards the second cause of action, we rely on the conclusions stated in our former opinion.

The widow and heirs of José D. Riera defendants herein have also filed a motion for reconsideration based on questions which were decided in our former opinion, and which we do not deem it necessary to discuss further.

The reconsideration requested must be denied.