STATE, EX REL. ATTORNEY GENERAL *v.* BROADAWAY.

4-4295

Opinion delivered April 27, 1936.

*Carl E. Bailey,* Attorney General, *Leffel Gentry* and *Walter L. Pope,* for appellant.

*Rose, Hemingway, Cantrell & Loughborough, J. A. Tellier, Owens & Ehrman* and *E. L. McHaney, Jr.,* for appellees.

Moore, Special C. J.   The State sues A. C. Broadaway, Urey Haden, Dwight H. Blackwood and J. L. Williams to recover moneys claimed to have been unlawfully paid out of its treasury in consequence of their alleged fraudulent conspiracy.   Fidelity & Deposit Company of Maryland is sued as surety on the bonds of Blackwood and Williams as members of the State Highway Commission, and as surety on the bond of Blackwood as its disbursing agent.   Wils Davis, a Tennessee attorney, was named in the complaint as a defendant, but was never served with process and brought into the case.

The facts furnishing the foundation of suit may be summarized as follows:   During the term of office of Blackwood as Chairman, and of Williams as a member of the State Highway Commission, and on December 9, 1930, Davis addressed a letter to J. S. Parks, another member of the Commission, in which he said:   "Some

time ago, on behalf of Road Improvement Districts Nos. 1, 2 and 3 of Dallas County, and Marshall-Witt Springs Road Improvement District of Newton County, we filed claims with the Highway Department for refund of interest paid by these districts after January 1, 1927, and we desire now to submit to you evidence of these payments.'' Attached to the letter were certain checks and drafts issued and paid out of funds they then had on hand by the four districts in January, 1927. The payments aggregated $24,799.34, and were made upon bond and interest obligations maturing February 1, 1927, a few days before the approval of act No. 11 of the General Assembly of 1927, commonly known as the Martineau Road Law.

The claims were referred to V. A. Kleiber, the Commission's Auditor, and on February 20, 1931, he wrote Davis returning the checks and drafts, and advising that the claims had been disallowed at the Commission's meeting of February 18, 1929. On May 1, 1931, a letter was addressed, over the signature of Blackwood as Chairman of the Commission, to Claude Duty, at that time Assistant Attorney General assigned to the Highway Department, enclosing the checks and drafts, and inquiring whether the Commission under the law should pay them. Mr. Duty's answer, bearing date of May 2, 1931, was: ''* * * We have carefully studied these claims, and while they were paid during February, 1927, into the respective banks, by the several districts, yet it is our opinion that if these districts were equally without and within, or if a majority of them were without the State Highway System, you should recognize these claims as valid charges against any funds that you might have remaining in your appropriation on account of act No. 153 of the Acts of 1929. It is our opinion, in short, that these payments made as they were, in error, by the several districts, that is to say, the whole transaction, would amount to debts against the several districts, and would therefore be payable under the above act.''

On May 23, 1931, Davis presented to the Auditor of State, voucher No. 410, of the Highway Commission, for the sum of $21,714.13. The voucher bore date of April

30, 1931, was signed with the name of D. H. Blackwood as Chairman of the Commission, was countersigned by C. S. Christian as State Highway Engineer, and bore the certificate of M. H. Thomas as Secretary of the Commission to the effect that the approval of the claim appears of record in the Commission's minutes of March 1, 1929. In the body of the voucher appeared an itemized statement showing the amount in which the claim of each of the four districts had been allowed, and under this statement appeared the notation "Items above listed being paid under opinion of Attorney General, dated May 2, 1931."

On May 23, 1931, the Auditor issued against voucher No. 410 State warrant No. 181,505 for $21,714.13, payable to Davis as attorney. The warrant was presented by Davis to the State Treasurer who issued to him two checks payable at the Bankers Trust Company of Little Rock, both dated May 23, 1931, and respectively for $2,000 and $19,000. The Treasurer paid Davis in cash $714.13. The minutes of the Highway Commission show that at a meeting held June 25, 1931, at which all of the Commissioners were present, voucher No. 410 in the sum of $21,714.13, was, on the motion of J. S. Parks, seconded by S. J. Wilson, approved for payment along with a large number of other vouchers, some of which appear to have been for bond and interest payments. This is the only record evidence showing consideration of the claim by the Commission as a whole.

The facts so far recited relate only to the presentation, allowance and payment of the claims. Turning to the distribution of the proceeds, the record shows that on May 23, 1931, the $2,000 check, bearing the indorsement of Davis as attorney and of Claude Duty, was paid by the Bankers Trust Company, and that the check for $19,000, bearing the indorsement of Davis, was deposited on May 25, 1931, to his credit in the Bank of Osceola, of which Williams was president. At the top of the ledger sheet showing the deposit account appears in pen and ink the name J. L. Williams. Out of the account was cashed on May 27, 1931, a check in favor of A. C. Broadaway for $9,642.03, leaving, after other withdrawals, a

balance of $6,000. On July 2, 1931, $4,000 was charged against the account upon a debit slip of that date, bearing the notation "Wils Davis—D. H. B." The balance of the account was paid out for the use and at the direction of Williams.

The record shows that of the money collected by Davis, Broadaway and Haden, who had procured from all of the road districts except one contracts upon a fifty per cent. basis to collect their claims against the Highway Department, and who had employed Davis to represent the districts before the Commission, received $714.13 in cash, plus $9,642.03, the proceeds of the check above mentioned. They paid to Marshall-Witt Springs Road District, whose claim had been allowed in the sum of $6,045.07, $1,500; to Road District No. 2 of Dallas County, whose claim had been allowed in the sum of $3,085.21, $200; and to Road District No. 3 of Dallas County, whose claim had been allowed in the sum of $5,568.89, $200. Road District No. 1 of Dallas County, whose claim had been allowed in the sum of $7,014.99, received nothing. Less than $2,000 of the $21,714.13 reached the districts on whose behalf claims had been filed.

The State in its complaint predicates its case upon allegations of conspiracy. It is alleged that on or about December 1, 1930, all of the defendants conspired together to wrongfully and corruptly take from the treasury the sum of $21,714.13, and that from that date they jointly pursued their corrupt design until its consummation. It is alleged that Blackwood's issuance of the voucher was without lawful authority and a breach of official duty, and with the unlawful and corrupt design of wrongfully taking money from the treasury, a part of which he was to and did receive individually; and that Williams participated in the collection of the warrant by depositing its proceeds to his credit in the Bank of Osceola, thereby unlawfully appropriating the proceeds to his own use in violation of his trust as a member of the Highway Commission. The final allegation is in effect that Broadaway and Haden, and Davis whom they had employed, caused Blackwood and Williams to do

the acts with which the latter are charged, and thus actively participated in the withdrawal of funds from the treasury. to pay claims that did not constitute legal obligations of the Highway Department, and which it had no right or duty to pay. Judgment is asked against all of the defendants in the full sum of the voucher with interest and against the bonding company as surety on the bonds of Blackwood and Williams. Blackwood and Williams answered, denying all of the allegations of the complaint, and the bonding company answered with similar denials and pleaded other defenses which, in view of the conclusion we have reached, it is unnecessary to consider.

The evidence directly touching the issue of conspiracy is contained in the testimony of Blackwood and Williams, both of whom took the stand. Blackwood admits obtaining $4,000 from Williams, his brother-in-law, on or about July 2, 1931. He testified that in the fall of 1930 Williams and his associates were forced to increase the capital stock of their bank and that at Williams' request he took and paid for $4,000 of the new stock. He stated that he did not want the stock as he had other uses for his money, but purchased it upon Williams' promise to lend it back to him the following summer should he need it. That in June, 1931, desiring to purchase some property in Indiana, he advised Williams that he needed the money and requested a loan of it. Williams acquiesced, and Blackwood at his direction went to Osceola, signed a note for $4,000 payable to Williams without interest, and obtained the money. His testimony is that he never knew that Davis owed Williams any money and was ignorant of the fact that the money loaned him by Williams came out of any payment made by Davis to Williams, or that it was a part of or had any connection with the proceeds of the claims allowed Davis by the Highway Department. He recalled that Davis had claims before the Department and remembered his being before the Commission at its meetings, but denied ever having talked to Davis personally about the claims, and stated that he never had any talk,

conversation or agreement with any one with reference to approving the claims. The record shows that by November 4, 1935, Blackwood had repaid Williams $3,925.

Williams substantially corroborated the statements of Blackwood, and in addition testified that during the pendency of the claims before the Department he had no conversation with Blackwood concerning them. Regarding his relations with Davis, Williams testified that for a number of years they had been friends, during which time he had occasionally lent Davis money, and that at the time of the presentation of the claims to the Highway Department by Davis the latter still owed him about $7,000, which he had promised to pay as soon as possible. He assumed that Davis would be able to pay him something out of whatever fee he made on his claims, but had no agreement as to how much he would pay. He voted to approve the claims, but not for the purpose of getting Davis in any position to pay him. The claims, when submitted to the Commission, probably came up on a long list of fifty others, and they were approved all at once. He denied any conspiracy and stated that the claims would not have been paid had they not been approved by the Attorney General. He recalled Davis having spoken to him a time or two about the claims, but stated that it was not unusual for a lawyer to speak to the Commissioners about such matters. He testified further that after Davis made the collection he deposited the money in the Bank of Osceola, of which he, Williams, was president, and paid $6,000 upon his indebtedness. Supplementing this testimony is that of Miss Cox, at that time cashier of the Bank of Osceola, who exhibited an account book showing loans made by Williams to Davis during the years beginning 1922 and running through 1930, and who stated that at the time of the deposit of the Treasurer's check for $19,000 Davis told her that he was paying $6,000 of it to Williams, and that Williams' name was placed in pen and ink on the ledger opposite Davis' name at the direction of the former after the bank was closed in December, 1931, so that he could be identified with the balance. Williams admitted receiving and using $6,000 of the account.

Both Williams and Blackwood denied ever having had any conversation or dealings with Broadaway and stated that they had never seen or known him until after the Comptroller began his investigation in 1934.

In connection with the testimony just outlined, certain other testimony must be considered. It was shown that the Commission opposed the passage of act 153 of 1929—the act under which the claims in question were approved for payment—and originally rejected all claims presented under it; but that after the decision in the case of *Arkansas Highway Commission* v. *Otis & Co.,* 182 Ark. 242, 31 S. W. (2d) 427, the Commission decided to pay all of them that there was no suspicion attached to. Justin Matthews, at that time a member of the Commission, testified that the lists of claims were so voluminous that it became necessary for the Commissioners to rely upon the Department's employees for information regarding them. Claims did not come up singly for approval, but had to be passed upon in such numbers that it was necessary for the Commission to approve long lists of them at one time. Other road districts, he testified, had paid out money on interest maturing about January 1st, and they filed claims which were paid; the Commission being of the impression that under the decisions of the Supreme Court they had to pay them under act 153.

From the testimony of M. H. Thomas, Secretary of the Commission from 1928 to 1932, and in charge of its minutes, it appears that many other vouchers approved by the Commission June 25, 1931, had been paid prior to that meeting, and that the list of vouchers approved at the meeting contained fifty to seventy-five pages on each of which were listed about sixty-five vouchers. It was the usual procedure of the Department to issue the vouchers, and if there was no doubt concerning their validity to release them to the claimants, and to have them approved at the next meeting of the Commission. If there was doubt, the Attorney General would be asked for an opinion before the release of the voucher. If his opinion was favorable, the voucher was released; otherwise it was held. When the Attorney General ap-

proved the claim, the Department usually paid it and later submitted it to the Commission for approval. The Commission's procedure was also described by I. B. Graydon, in charge of its disbursements from 1921 until 1931, whose duty it was to prepare the vouchers on such claims as were approved; and by C. S. Christian, Engineer for the Department from 1927 to 1932. Their testimony is substantially the same as that just set forth, it being stated that the signatures of Blackwood, as Chairman, and Christian, as Engineer, were usually placed upon vouchers by the Auditor for the Department; they, on account of the volume of vouchers to be issued, having undertaken to delegate that authority to the Auditor. Claims were customarily audited by Graydon, who prepared the vouchers for signature by Kleiber, the Auditor. If there was no question about the claim it was at once mailed or delivered to the claimant; if subject to any question, it was held for further inspection.

Seven instructions were requested on behalf of the State. All were refused by the Court, which then offered to submit the case to the jury on the question of the good faith of Blackwood and Williams as Highway Commissioners in approving the claims for payment. The State objected to submission upon that issue and the Court then instructed a verdict for the defendants. The first, fifth, sixth and seventh requests were peremptory and were properly refused in any view of the case. The second and third would have advised the jury that if Blackwood and Williams aided in the issuance or collection of the voucher with the expectation of sharing in the money to be collected by the payee, and did share therein, they were liable for its face amount with interest. The fourth request was to the effect that, although neither Blackwood nor Williams aided in the issuance or collection of the voucher with the expectation of sharing in its proceeds, yet if either received any of the money collected thereon by the payee they would be liable for such amount as they received, unless they received it in good faith and without knowledge that it was part of the proceeds of the warrant involved.

We have concluded that all three requests were properly refused. The second and third would have allowed an improper measure of recovery. *United States* v. *Carter,* 217 U. S. 286, 30 S. Ct. 515. And moreover, since all three necessarily present the issue of the good faith of the defendants, it was necessary, before the trial court would have been justified in granting them, that proof be adduced sufficient to carry that issue to the jury. That is to say, before the court could properly have so instructed the evidence must have justified the submission of the issue of conspiracy to the jury. It is our opinion that in that respect the record was not sufficient. It is, of course, elementary that a public officer occupies a fiduciary position, and that in disbursing public funds he must be as free from selfish interest, direct or indirect, as any other trustee. On the other hand, the law presumes that every public officer does his duty and performs faithfully those matters with which he is charged, and where the contrary is alleged the burden of proof is upon the State. 22 R. C. L., Public Officers, § 143, and cases cited.

The allegation of the complaint is that Blackwood and Williams conspired with Davis, Broadaway and Haden to corruptly take from the treasury $21,714.13, and that in consequence of this conspiracy they aided in and furthered the issuance of voucher No. 410. Upon this allegation, what is the proof? In the case of Blackwood, aside from the fact that the $4,000 borrowed by him from Williams in July, 1931, which turned out to be a part of the proceeds of the voucher issued to Davis, the substance of the testimony is that while prior to the issuance of the voucher he knew Davis had these claims before the Department, he had no conversation with any one about them, and had no part in their allowance save as a member of the Commission voting therefor. His explanation of the loan from Davis to him is not unreasonable, and he denies knowing that the $4,000 loaned him was a part of the proceeds of the voucher, which had been issued and collected some five or six weeks before the loan. This testimony comes from Blackwood alone, but there is nothing in the record inconsistent with it.

Williams, it is true, admits that Davis was in debt to him at the time the claims were presented to the Department, and that he intended, if they were allowed, to collect from Davis out of his fee part of what the latter owed him. While $19,000 of the proceeds of the voucher was subsequently deposited in Williams' bank, out of which he collected $6,000 from Davis, there is no evidence tending to show that Williams' conduct as a Commissioner prior to the issuance of the voucher was influenced by his relation with Davis, or that he in turn talked with or made any attempt to influence the action of Blackwood or any other Commissioner. To the contrary, the testimony was that Blackwood and Williams never discussed the matter. It appears from the testimony of Matthews and the employees of the Highway Department that after the passage of act 153 the number of claims presented to the Department was so great that they were customarily approved by the Commissioners *en masse* after having been first investigated by the Department's employees. For aught that appears the claims in question, if actually approved prior to the issuance of the voucher, were approved in that manner. When the issuance of the voucher was finally approved or ratified on June 25, 1931, it was approved as one of a list of other vouchers covering some fifty or seventy-five sheets. There is no evidence that these claims were handled any differently from the other claims presented to the Department under act 153.

Williams was not a party to or interested in the claims. He desired, of course, to collect from Davis what the latter owed him, but it is not to be presumed, especially in the complete absence of evidence that he sought to aid in the allowance of the claims or to influence the action of other Commissioners with reference thereto, that his own action was influenced by selfish interest, and that he permitted himself to act in a manner inconsistent with his trust as a public officer. Suspicion cannot take the place of proof, and while, as has been remarked, public officers are regarded as trustees and held to a high degree of accountability, we are

not willing to hold that the payment by Davis of his indebtedness to Williams can raise an inference of official misconduct on Williams' part in the face of the testimony just referred to. We conclude, therefore, that the evidence was insufficient to carry to the jury the issue of conspiracy, and that the court correctly refused the State's requests for instructions numbered two, three and four.

It has been suggested that had there been sufficient evidence of conspiracy to submit to the jury, the issue was withdrawn by the State's action in objecting to its submission when the court offered to submit it generally after having denied the State's request for its other instructions; and there may be some question as to whether the issue was, under the circumstances, not waived by the State. *Toplitz* v. *Hedden,* 146 U. S. 252, 13 S. Ct. 70, 36 L. Ed. 961. We prefer, however, to place our conclusion upon the broader ground.

It remains to determine whether the trial court was correct in instructing a verdict for the defendants. It is argued on behalf of the State that the claims for which voucher No. 410 was issued were not legal obligations of the department, were unlawfully paid, and that Blackwood and Williams, regardless of motive and in the absence of fraud or conspiracy, are liable to the State for the amount of the voucher. In considering this branch of the case, Blackwood and Williams must be assumed to have acted innocently, and the State's argument overlooks the question whether, having acted only as two members of the board of five, they can be held responsible for the board's action in approving the voucher. (*Tyrell* v. *Burke,* 110 N. J. L. 225, 164 Atl. 586; *Pidgeon Thomas Iron Co.* v. *LaFlore County,* 135 Miss. 155, 99 So. 677; 22 R. C. L., Public Officers, § 165). But we do not stop to decide that question since our decision is based upon another ground.

It is contended by counsel that the claims for which the voucher was issued were within act 153 of 1929, and, if not, were payable under the Martineau Road Law. We agree with the State that these claims were payable under

neither statute and were not legal obligations of the Highway Department. The claims were made on behalf of the districts for bond and interest payments made by them in January and on February 1, 1927. Without stopping to analyze act 153 in detail, it is sufficient to say that in our opinion on its face it excludes such items, and that in the case of *Grable* v. *Blackwood*, 180 Ark. 311, 22 S. W. (2d) 41, it was construed as authorizing the payment of district indebtedness *other* than bonds. It is unnecessary to examine § 3 of act 11 of 1927, because act 112 of 1927 expressly provides in § 1 that any balance of money in the hands of road improvement districts after January 1, 1927, shall be used to pay bonds and interest maturing thereafter, and in § 4 empowers the Highway Commission to require the districts to remit any such funds on hand for application to the payment of such bonds and interest.

The case narrows to the question whether Blackwood and Williams, as members of the Highway Commission, are legally liable to the State for approving in good faith the issuance of a voucher to pay claims that did not constitute lawful obligations of the department and which it had no legal power to pay. The State here contends that the voucher was issued after the appropriation made in act 153 had expired, and that the commission in issuing it acted without the scope of its authority and without jurisdiction. The appropriation in connection with act 153 was made available by reference to § 7 of act 18 of 1929, and expired February 28, 1931. But act 781 of the General Assembly of 1923, § 8, provides: "any disbursing agent may draw a voucher against an appropriation made for an agency, if there is sufficient unvouchered balance, at any time during the period for which the appropriation is made and during the two months immediately following." A later provision of the act is that the auditor may "issue" a warrant on the voucher at any time not later than three months after the expiration of the period for which the appropriation is made, and the word "draw" as it appears in that part of the act just quoted is therefore used in the sense of preparing or drawing

a voucher, as distinguished from issuing and delivering it. Voucher No. 410 bears date of April 30th, and must be presumed to have been drawn on that date in the absence of evidence to the contrary. The fact that there appears upon it an indorsement to the effect that the items therein are being paid under an opinion of the Attorney General of May 2, 1931, was fully explained, and is not inconsistent with the presumption. We, therefore, hold that the appropriation had not expired when the voucher was drawn.

The claims were presented to the Commission as items payable under act 153. Under that act, it was the duty of the Commission to determine the validity and the amount of all items so presented. *Arkansas State Highway Commission* v. *Otis & Co.,* 182 Ark. 242, 31 S. W. (2d) 427. In so doing it acted as a *quasi* judicial body, and the rule is that officers acting in that capacity are immune from liability for errors of judgment when acting without wilfullness, malice or corruption. *Tyler* v. *Cass County,* 142 U. S. 288, 12 S. Ct. 225, 22 R. C. L., Public Officers, § 163. Here may be mentioned counsel's argument that there is no evidence of the claims having been approved before the issuance of the voucher. The contention, if material, is answered by the principle that the action of judicial officers is presumed, in the absence of evidence to the contrary, to be regular, and that acts done by such officers which presuppose the existence of other acts to make them legally operative, are presumptive proof of the existence of the latter. *Knox County* v. *Ninth National Bank,* 147 U. S. 91, 13 S. Ct. 267; *Nofire* v. *United States,* 164 U. S. 657, 17 S. Ct. 212. But since the issuance of voucher No. 410 was approved, June 25, 1931, by the full Commission, it becomes immaterial whether the claims were or were not approved before the issuance of the voucher, since the Commission had the power to ratify, and thus validate, any act that it had jurisdiction to perform in the first instance.

Having reached the conclusion that the Commission had jurisdiction to consider the claims, it follows that it acted within the scope of its authority in seeking the At-

torney General's opinion as to whether they were legally payable. The reply of the Attorney General was in effect that the claims were legal obligations under act 153 of 1929, and as such payable out of any funds remaining in the appropriation. In delivering the voucher and in approving it the Commission acted upon the advice of the Attorney General, and its members are therefore protected against liability to the State under the rule laid down in *State* v. *Fidelity & Deposit Company of Maryland*, 187 Ark. 4, 58 S. W. (2d) 696. There being no liability on the part of Blackwood and Williams, it follows that none attaches to the surety upon their official bonds.

The views above expressed compel the conclusion that the trial court was correct in instructing a verdict for the appellees, Broadaway and Haden, there being no evidence of any conspiracy or collusion, direct or indirect, between them and any member of the Highway Commission. It follows that the court correctly instructed a verdict for all of the appellees, and the judgment is affirmed.

HUMPHREYS and MEHAFFY, JJ., and McMILLEN, Spl. J., dissent.

McMILLEN, Sp. J. (dissenting). It is conceded in the opinion of the majority of the court that the claims were not legal obligations of the highway department under act 153 of 1929, or the Martineau road law. Therefore $21,714.13 was illegally taken from the state of Arkansas.

The only evidence relied on by the majority in holding that the trial court was correct in directing a verdict for the defendants is the testimony of Blackwood and Williams who were vitally interested in the result of the trial. This court has consistently held it is error to direct a jury to find according to the testimony of a witness, if he is interested in the result of the trial, or if his testimony contains such inconsistencies or inaccuracies as would have warranted the jury in declining to accept as established the existence of facts which depend entirely upon his testimony. *Merchants' Fire Ins. Co.* v. *McAdams*, 88 Ark. 550, 115 S. W. 175.

This court has also consistently held that "where there is any substantial evidence to support the verdict

the question must be submitted to the jury. In testing whether or not there is any substantial evidence in a given case, the evidence and all reasonable inferences deducible therefrom should be viewed in the light most favorable to the party against whom the verdict is directed, and, if there is any conflict in the evidence or where the evidence is not in dispute, but is in such a state that fair-minded men might draw different conclusions therefrom, it is error to direct a verdict." *Smith* v. *McEachin,* 186 Ark. 1132, 57 S. W. (2d) 1043.

Measured by these rules, I am of the opinion the evidence is amply sufficient to warrant a submission of this case to the jury on the issue of conspiracy on the part of the defendants.

Even though the evidence were not sufficient to warrant the submission of that question to the jury, since it is conceded that the money was paid out illegally and without authority of law, the state has the undoubted right to recover the money that each of the defendants received. The allegations in the complaint state a cause of action for money had and received, and that form of action is "maintainable in all cases where one person has received money or its equivalent under such circumstances that in equity and good conscience he ought not to retain it and *ex aequo et bono* it belongs to another." 2 R. C. L., page 778; *Emery* v. *United States,* 13 Fed. (2d) 658; *Wisconsin Central Railroad Co.* v. *United States,* 164 U. S. 190, 17 Sup. Ct. 45, 41 L. Ed. 399. It is only necessary to read the statement of facts set out in the opinion of the majority to determine that the appellees received money that in equity and good conscience they ought not to retain.

Mr. Justice HUMPHREYS and Mr. Justice MEHAFFY concur in the views here expressed.