Opinion
 

 JANES, J.
 

 In these consolidated appeals we review trial court determinations of the parties’ conflicting claims to the following monies, all of which have been intercepted and withheld by the State Controller: (1) pension benefits due William G. Bonelli (now deceased) and Mary P. Bonelli, his widow; (2) a $15,000 security deposit posted by the Bonellis with the Franchise Tax Board pending resolution of their tax liability for the years 1952 and 1953; and (3) the sum of $4,591 found due the Bonellis as an income tax refund upon resolution of their 1952 and 1953
 
 *463
 
 tax liability. The state and its Controller (hereinafter controller) appeal from judgments which favor the Bonellis on all issues.
 

 In 3 Civil 14089 the appeal is from a judgment declaring that alleged bribe money received by Bonelli may not be set off against the widow’s pension benefits to which Mrs. Bonelli is entitled; in 3 Civil 14378 the appeal is from a judgment on the pleadings which denied the People’s request for an accounting from Bonelli of $250,000 assertedly received from liquor licensees as bribes while he was a member of the Board of Equalization and from judgment on a cross-complaint which ordered the controller to pay to the estate of William G. Bonelli (1) pension benefits due him and accrued prior to his death, (2) the $15,000 security deposit, and (3) the $4,591 state income tax refund. The judgment further provided for interest at the legal rate of 7 percent.
 
 [1]
 

 Facts
 

 The following relevant facts are undisputed.
 

 The Pension Benefits
 

 Bonelli was elected to the Assembly in November of 1930 and served until 1933. In 1935 he became Director of the Department of Professional and Vocational Standards and served until April of 1938. On April 3, 1938, he' was appointed to the State Board of Equalization and was elected to successive four-year terms until defeated for reelection in 1954.
 

 In 1954 Bonelli was indicted by the San Diego County Grand Jury for conspiring to commit the crime of soliciting and receiving contributions, in return for favorable treatment, from applicants and persons licensed by the Board of Equalization to sell alcoholic beverages. From 1955, and until his death, Bonelli was a fugitive from justice living in Mexico. (See
 
 Bonelli
 
 v.
 
 Flournoy
 
 (1967) 250 Cal.App.2d 495, 497 [58 Cal.Rptr. 535].)
 

 During the foregoing terms of office, Bonelli was a member of the Legislators’ Retirement System. On December 15, 1958, having attained the age of 63 years, he filed a written application for his retirement benefits. On January 8, 1959, the Board of Administration of the State
 
 *464
 
 Employees’ Retirement System granted Bonelli his retirement and advised him that his first warrant would be mailed to him early in February 1959.
 

 On March 3, 1959, the controller made a demand upon Bonelli that he account for monies improperly received from liquor licensees and advised him that his pension payments were being intercepted and impounded by the controller in a special “William G. Bonelli” deposit fund in the state treasury until there was a balancing of accounts, the controller taking the position that these monies were owed to the state. Bonelli disregarded the controller’s demand and no pension payments were ever received by him. The impoundment continued until Bonelli’s death on November 21, 1970.
 
 [2]
 

 In making application for retirement, Bonelli had elected to receive his allowance under Option No. 3 of the Legislators’ Retirement System, naming his wife as the beneficiary to whom the payments were to be made after his death. On Januaiy 4, 1971, she as his widow filed a claim for retirement benefits. On August 17, 1971, the administrator of the retirement system approved the claim. Beginning September I, 1971, the retirement system commenced drawing monthly warrants for payment to her and has done so on a monthly basis since that date. However, each month the warrants have been intercepted by the controller and deposited by him in the “Mary P. Bonelli Special Deposit Fund” in the state treasury. His purpose was to offset an indebtedness in the sum of $59,300 assertedly owed to the state by Bonelli.
 

 The Security Deposit and Tax Refund
 

 On February 27, 1959, the Franchise Tax Board notified the Bonellis that deficiencies for 1952 and 1953 had been found upon examination of their income tax returns. The Bonellis were notified that they could “stay collection and prevent the assessment from becoming final” by filing a petition for reassessment accompanied by security. Pursuant to that advice, the Bonellis, on March 9, 1959, filed with the board a petition for reassessment and a cashier’s check in the sum of $15,000 payable to the board.
 

 
 *465
 
 On June 8, 1966, the Bonellis were notified that their tax liability had been reconsidered and the deficiency assessment withdrawn. They immediately demanded the return of their $15,000 and the $4,591 state income tax refund due them for the years in question, together with interest on the refund.
 

 Prior to notice to the Bonellis of the results of the tax audit, the controller, on May 26, 1966, advised them that he had intercepted and impounded both the $15,000 deposit and the $4,591 tax refund and was holding said funds in trust for them pending an accounting between Bonelli and the state.
 

 Discussion
 

 The controller’s principal contention is that Government Code section 12419.5
 
 [3]
 
 allows him to offset from the amount intercepted and held by him a sum equal to the amount of the bribes. The contention assumes that monies received as bribes are the property of the state, and therefore are sums “due a state agency from a person . . . [which may be offset] against any amount owing such person ... by any state agency.” (§ 12419.5.)
 

 For the purpose of this decision, we indulge the same assumption, since—as to the pension benefits—the offset issue will be controlled by our resolution of the conflict between sections 12419.5 and 9359.3, and—as to the security deposit and tax refund—the offset statute is inapplicable because those funds have always been (and the controller so concedes) the property of the Bonellis. The latter funds, held in trust for
 
 *466
 
 them by the state, simply fail to qualify under the offset provision as “any amount owing... by any state agency.” (Italics added.)
 
 [4]
 

 The Pension Benefits
 

 Section 9359.3 provides as follows: “The right of a person to any benefit or other right under this chapter and the money in the Legislators’ Retirement Fund are not subject to execution, garnishment, attachment, or any other process whatsoever,” and forbids insofar as here relevant, any assignment of such money.
 

 “It is well settled that retirement benefit rights—including pensions whether for age and service, disability or death—are vested [citations].”
 
 (Dickey
 
 v.
 
 Retirement Board
 
 (1976) 16 Cal.3d 745, 748 [129 Cal.Rptr. 289, 548 P.2d 689].) The strong public policy opposing interference with such vested pension rights, even in the face of official wrongdoing, was reaffirmed by the California Supreme Court in
 
 Willens
 
 v.
 
 Commission on Judicial Qualifications
 
 (1973) 10 Cal.3d 451 [110 Cal.Rptr. 713, 516 P.2d 1]. In
 
 Willens,
 
 a disabled judge who was removed from office for official misconduct involving bribery and criminal conspiracy was held entitled to receive disability retirement benefits. The court stated: “Since pension rights of this nature may be considered ‘vested’ rights
 
 (Pearson
 
 v.
 
 County of Los Angeles,
 
 49 Cal.2d 523, 543 [319 P.2d 624];
 
 Allen
 
 v.
 
 City of Long Beach,
 
 45 Cal.2d 128, 131 [287 P.2d 765];
 
 Wallace
 
 v.
 
 City of Fresno, supra,
 
 42 Cal.2d 180, 183 [265 P.2d 884]), the following rule would appear to govern: ‘In the absence of a valid . .. provision enacted prior to eligibility for retirement which provides for forfeiture, once a person who has undertaken public employment ... becomes eligible for retirement, his right to a pension cannot be destroyed merely because he is subsequently removed from office for his own misconduct. [Citation.] It is statutory law that “No conviction of any person for a crime works any forfeiture of any property, except in cases in which a forfeiture is expressly imposed by law . . . .” (Pen. Code, § 2604.)’
 
 (Pearson
 
 v.
 
 County of Los Angeles, supra,
 
 at p. 543.)” (10 Cal.3d at pp. 458-459.)
 

 In an opinion dealing with the Legislators’ Retirement Law, the Attorney General, citing
 
 Willens,
 
 and after an analysis of
 
 Pearson
 
 and its antecedents, concluded that the perjury conviction of a former Lieuten
 
 *467
 
 ant Governor “would have no effect upon the Lieutenant Governor’s retirement benefits” (57 Ops.Cal.Atty.Gen. 374, 375, 386-387), except in the event the Lieutenant Governor became a fugitive from justice (§ 9355.16, discussed
 
 infra).
 

 The
 
 Pearson
 
 rule appears to rest on two bases. First, the requirement that liberal construction be given pension legislation to the end that the beneficent results thereof may be achieved.
 
 (Gorman
 
 v.
 
 Cranston
 
 (1966) 64 Cal.2d 441, 444 [50 Cal.Rptr. 533, 413 P.2d 133]; see also
 
 Jorgensen
 
 v.
 
 Cranston
 
 (1962) 211 Cal.App.2d 292, 296 [27 Cal.Rptr. 297].) Among those results are the protection of the employee and his family from economic insecurity.
 
 (Willens
 
 v.
 
 Commission on Judicial Qualifications, supra,
 
 10 Cal.3d at p. 456.) The second basis is the statutory prohibition against forfeiture of property for conviction of crime except where forfeiture is expressly authorized by the Legislature. (Pen. Code, § 2604.
 
 [5]
 
 ) Pension benefits have been upheld in the face both of indictment for and conviction of crimes involving official misconduct. (See, in addition to
 
 Willens
 
 and
 
 Pearson, supra, Skaggs
 
 v.
 
 City of Los Angeles
 
 (1954) 43 Cal.2d 497 [275 P.2d 9]; cf.
 
 MacIntyre
 
 v.
 
 Retirement Board of S. F.
 
 (1941) 42 Cal.App.2d 734 [109 P.2d 962].)
 

 Our conclusion in support of the Bonellis on the issue of pension benefits is buttressed somewhat by the enactment, in 1959, of section 9355.16.
 
 [6]
 
 That section reflects clearly the Legislature’s intent to avoid forfeiture of accumulated contributions by providing for suspension of membership in the system during the pendency of a criminal charge, and by permitting withdrawal of those contributions during the period of suspension. (See also, § 9355.2.) Inasmuch as the facts at bench arose
 
 *468
 
 prior to the adoption of section 9355.16, its provisions are expressly inapplicable to the Bonellis.
 

 Turning next to the conflict between sections 12419.5 and 9359.3, it is the controller’s position that the pension exemption statute is designed to protect the employee from ordinary creditors and is not to be invoked in disputes between the employee and the entity paying the pension. He maintains that section 12419.5, the offset provision, which was enacted
 
 after
 
 section 9359.3, the exemption statute, is the controlling provision, and contends that he is not subjecting the pension funds to attachment, garnishment, or other legal process, but is properly reducing the amount owed the state by withholding payments under the offset provision. Quite apart from the fact that the retirement system, and neither the controller nor the state, is the
 
 entity paying the pension,
 
 the position is untenable. In our view section 12419.5 was not intended to have the broad sweep contended for by the controller.
 
 [7]
 

 An opposing conclusion would tend to undermine rather than to maintain the integrity of the retirement system, despite the fact that one practical result, in the cases at bench, is that a possibly malfeasing state officer, first by his flight and apparent removal from the state of all his assets, and secondly, by his death, has effectively denied the state the means of recovering any ill-gotten gains acquired by breach of his public trust. The exemption statute (§ 9359.3) which protects retirement benefits from invasion by “execution; garnishment, attachment, or any other process whatsoever” must control over the more general setoff statute (§ 12419.5) if effect is to be given to the rule of law that pension legislation shall be liberally construed. (See also § 21201 [Public Employees’ Retirement System]; § 31452 [County Employees’ Retirement Law]; Code Civ. Proc., § 690.18; and see,
 
 Kruger
 
 v.
 
 Wells Fargo Bank
 
 (1974) 11 Cal.3d 352, 370-371 [113 Cal.Rptr. 449, 521 P.2d 441, 65 A.L.R.3d 1266] [attempted setoff against state unemployment and disability insurance benefits].)
 

 On the sub-issue of the statute of limitations, we summarily reject the controller’s contention that Mrs. Bonelli’s action is barred by the three-year statute (Code Civ. Proc., § 338, subd. 1). Under well-settled law, her cause of action accrued no earlier than November 21, 1970, the
 
 *469
 
 date of her husband’s death.
 
 (Driscoll
 
 v.
 
 City of Los Angeles
 
 (1967) 67 Cal.2d 297, 304 [61 Cal.Rptr. 661, 431 P.2d 245];
 
 Dillon
 
 v.
 
 Board of Pension Commrs.
 
 (1941) 18 Cal.2d 427, 430 [116 P.2d 37, 136 A.L.R. 800].) Her action was filed in superior court November 12, 1971.
 

 The Security Deposit and Tax Refund
 

 The trial court, in granting the Bonelli estate relief on its cross-complaint, did not consider the offset provision (§ 12419.5) but based its decision solely on the previous determination in Mrs. Bonelli’s action that the state had no right to recover any monies received by Bonelli as bribes, and therefore there would be nothing to offset.
 

 The controller, relying solely on the dictum in
 
 Bonelli
 
 v.
 
 Flournoy, supra,
 
 250 Cal.App.2d 495 (see fn. 7,
 
 ante,
 
 p. 468), takes the position that both the $15,000 and the $4,591 were automatically available to the state under the offset provision.
 

 On the other hand, counsel for the estate correctly asserts that the security deposit and, upon its determination, the tax refund, are the property of the Bonellis held in trust for them by the state, and therefore fail to qualify under the offset provision as “any amount owing ... by any state agency . . . .” (See fn. 4,
 
 ante,
 
 p. 466, and accompanying text.) Further, the controller violated the state’s trusteeship obligations by withholding payment of these items. Although not specifically asserted with respect to the pension benefits, it follows, of course, that to the extent of Mr. Bonelli’s contributions to his retirement fund, those sums also have remained the property of the Bonellis, held in trust by the retirement system.
 

 Propriety of the Remedy
 

 Although not discussed by the parties, we address briefly the mode of relief sought by the Bonellis. In affirming the judgments granting mandate, the court does not act as a helpless, amoral puppet, insensitive to the emanations of corruption arising from William Bonelli’s 1954 indictment and flight. (See fn. 1,
 
 ante,
 
 p. 463.) Equitable factors play an important role in determining the availability of mandamus; the writ should not issue in aid of one who does not come into court with clean hands.
 
 (San Diego County Dept. of Pub. Welfare
 
 v.
 
 Superior Court
 
 (1972) 7 Cal.3d 1, 9 [101 Cal.Rptr. 541, 496 P.2d 453].)
 
 *470
 
 One who sets the judicial process in motion may have the doors of the court shut against him if his conduct has violated conscience or good faith.
 
 (DeGarmo
 
 v.
 
 Goldman
 
 (1942) 19 Cal.2d 755, 764-765 [123 P.2d 1].)
 

 The retirement allowance over and above Mr. Bonelli’s cash contributions is a form of deferred salary, payable by contract.
 
 (Dickey
 
 v.
 
 Retirement Board, supra,
 
 16 Cal.3d 745, 748-749;
 
 Willens
 
 v.
 
 Commission on Judicial Qualifications, supra,
 
 10 Cal.3d 451, 456, fin. 6.) A pension claimant may enforce his pension rights by mandate. Here the question of clean hands comes to the fore. We have previously accepted the premise that corrupt profits in the hands of a state official are held in constructive trust for the state (see
 
 United States
 
 v.
 
 Carter
 
 (1910) 217 U.S. 286, 306 [54 L.Ed. 769, 775, 30 S.Ct. 515];
 
 Jersey City
 
 v.
 
 Hague
 
 (1955) 18 N.J. 584 [115 A.2d 8, 11-15];
 
 Terry
 
 v.
 
 Bender
 
 (1956) 143 Cal.App.2d 198, 211 [300 P.2d 119]; Rest., Restitution, § 190).
 

 A vigorous pursuit by the state of its claim for bribery money and frustration, of that pursuit by Bonelli’s asylum in Mexico would have supplied a strong basis for the unclean hands doctrine against Bonelli and anyone claiming under him.
 
 [8]
 
 The state did not vigorously pursue its claim. Not until 10 years had passed did the state attempt to serve process by publication and mail. (See
 
 People
 
 ex rel.
 
 Cranston
 
 v.
 
 Bonelli
 
 (1971) 15 Cal.App.3d 129 [92 Cal.Rptr. 828].) The state’s conduct moved the. superior court to label it “a startling example of dilatoriness.” Meanwhile, in 1966, Bonelli had filed a separate lawsuit attempting to vindicate his pension rights. (See
 
 Bonelli
 
 v.
 
 Flournoy, supra,
 
 250 Cal.App.2d 495.) Finally, in 1971, Mrs. Bonelli filed her own suit for the widow’s pension. Had the state been ready, willing and able to prove its charge of bribery, it could have pursued its claim early in the history of this litigation. The state did not do so. Its frustration is self-imposed and not attributable to process-dodging by Bonelli. Thus the facts do not arouse the unclean hands doctrine.
 

 Interest
 

 The final issue urged by the controller is that the trial court erred in awarding interest, as to the retirement funds, at the legal rate of 7 percent rather than at the lesser interest rate fixed by the provisions of the Legislators’ Retirement Law (§§ 9353.3, 9353.4).
 

 
 *471
 
 The controller relies upon
 
 Jorgensen
 
 v.
 
 Cranston, supra,
 
 211 Cal.App.2d 292, 301, where we held, inter alia, that where a special fund (there the Judges’ Retirement Fund) is involved, the contractual rate of interest specified therein applies, rather than the legal rate (Civ. Code, § 3287). Like the Judges’ Retirement Fund, the fund here involved is such a special fund. (§ 9354.) The Bonellis correctly point out, however, that since the monthly pension benefits have been paid out of the special fund and thereafter have been intercepted and held by the controller,
 
 Jorgensen
 
 has no application for the reason that the actions are not against the trustee of a special fund (as defined in Jorgensen) but upon a general monetary obligation of the state.
 
 (Mass
 
 v.
 
 Board of Education
 
 (1964) 61 Cal .2d 612, 625-626 [39 Cal.Rptr. 739, 394 P.2d 579].)
 

 The judgments are affirmed.
 

 Puglia, P. J„ and Friedman, J„ concurred.
 

 A petition for a rehearing was denied July 27, 1977, and the opinion was modified to read as printed above. Appellants’ petition for a hearing by the Supreme Court was denied October 13, 1977.
 

 [1]
 

 It was not established at trial that Bonelli did, in fact, accept bribes. Both actions proceeded, however, upon that assumption. Counsel adopt the same premise in their appellate briefs and we. too. will assume that bribes were paid to Bonelli.
 

 [2]
 

 The criminal action against Bonelli was not completed prior to his death. He did bring a petition for a writ of mandate in this court to compel the controller to pay him his pension. We declined jurisdiction on the basis he had adequate remedies in the ,superior court.
 
 (Bonelli
 
 v.
 
 Flournoy, supra,
 
 250 Cal.App.2d 495.)
 

 [3]
 

 “The Controller may, in his discretion, offset any amount due a state agency from a person or entity, against any amount owing such person or entity by any state agency. The Controller may deduct from the claim, and draw his warrants for the amounts offset in favor of the respective state agencies to which due, and for ány balance, in favor of the claimant. Whenever insufficient to offset all amounts due state agencies, the amount available shall be applied in such manner as the Controller, in his discretion, shall determine. If, in the discretion of the Controller, the person or entity refuses or neglects to file his claim within a reasonable time, the head of the state agency owing the amount shall file the claim in behalf of such person or entity; if approved by the Controller it shall have the same force and effect as though filed by such person or entity. The amount due any person or entity from the State or any agency thereof is the net amount otherwise owing such person or entity after any offset as in this section provided.”
 

 All code references herein are to the Government Code unless otherwise specified.
 

 [4]
 

 The controller, on the one hand, rejects the
 
 trust
 
 theory as to the security deposit and tax refunds; counsel for the Bonellis, on the other, argues (in his brieO for a constructive trust and (at oral argument) the theory of actual trust. We need not determine the character of the trust; we need only agree, as the controller concedes, that said sums are the property of the Bonellis and are merely held by the state.
 

 [5]
 

 “No conviction of any person for a crime works any forfeiture of any property, except in cases in which a forfeiture is expressly imposed by law; and all forfeitures to the people of the State, in the nature of a deodand, or where any person shall flee from justice, are abolished.”
 

 [6]
 

 “Any member of [the Legislators’ Retirement] system who is charged, by indictment, with the commission of any felony involving the accepting or giving, or offering to accept or give, any bribe, the embezzlement of public money, extortion, theft of public funds, perjury, or conspiracy to commit any of said crimes, arising directly out of his official duties, and who is a fugitive from justice, shall be suspended from membership in this system while such charge is pending and until final disposition of the charge. At any time during the period of suspension of membership, the person so suspended shall be entitled to withdraw his accumulated contributions from the system, and such withdrawal shall constitute an election to terminate membership in the system.
 

 “This section applies only to persons who are charged with the commission after the effective date of this section of a felony described in this section by an indictment filed after the effective date of this section.”
 

 [7]
 

 Language in
 
 Bonelli
 
 v.
 
 Flournoy, supra,
 
 250 Cal.App.2d 495, 499. which indicates that section 12419.5 might apply was identified clearly as dicta and failed to consider the possible impact of sections 9359.3 and 9355.16.
 
 Terry
 
 v.
 
 Bender
 
 (1956) 143 Cal.App.2d 198 [300 P.2d 119], cited therein, is a case in which no pension exemption was involved.
 

 [8]
 

 A distinction may be drawn, in respect to the clean hands doctrine, between the present case and
 
 Willens
 
 v.
 
 Commission on Judicial Qualifications, supra;
 
 no claim of a cross-debt arising from corrupt activity was raised in
 
 Willens.